## CHADWICK v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. November 17, 1905.)

No. 1,446.

**1. INDICTMENT—MOTION TO QUASH—GROUNDS.**

A motion to quash an indictment, based on an affidavit that the grand jury received certain incompetent evidence, is insufficient, where it is not alleged nor shown that there was not other and competent evidence on the subject upon which the indictment was based.

**2. CRIMINAL LAW—MOTION TO QUASH INDICTMENT—REVIEW OF RULING.**

A motion to quash an indictment is addressed to the sound discretion of the trial court, and in general its ruling thereon is not reviewable, and especially where the motion was heard on affidavits which are not in the record.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Criminal Law, § 3042.]

**3. CONSPIRACY—ELEMENTS OF OFFENSE—VIOLATION OF NATIONAL BANKING LAWS.**

While it is a settled rule of criminal law that an indictment for conspiracy will not lie where a plurality of agents is logically necessary to complete the crime which it was the object of the conspiracy to commit, such rule does not apply to an indictment under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], for a conspiracy between the defendant, who had no official connection with a national bank, and an officer of such bank to violate Rev. St. § 5208 [U. S. Comp. St. 1901, p. 3497], by causing a check of defendant drawn on the bank to be certified by such officer when defendant did not have a sufficient amount on deposit to pay the same.

**4. INDICTMENT—JOINDER OF COUNTS—COMPELLING ELECTION.**

Counts charging separate conspiracies with officers of a national bank for the violation by such officers of Rev. St. § 5208 [U. S. Comp. St. 1901, p. 3497], by certifying checks when the drawer did not have sufficient funds on deposit to pay the same, may be joined in the same indictment under Rev. St. § 1024 [U. S. Comp. St. 1901, p. 720], and, unless it apears that substantial rights of the defendant will be prejudiced by their trial together, the court may properly refuse to compel the government to elect between them.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Indictment and Information, § 447.]

**5. CRIMINAL LAW—EVIDENCE—ADMISSIONS.**

On the trial of an indictment for conspiracy, letters shown to be in the handwriting of the defendant, addressed to an alleged co-conspirator and containing self-charging admissions, are admissable in evidence, although it is not proved that they were transmitted to the persons to whom they are addressed, and their interpretation and weight are matters for determination by the jury in the light of all of the evidence in the case.

**6. CONSPIRACY—PROOF OF INTENT—KNOWLEDGE OF THE LAW.**

On the trial of an indictment charging defendant with conspiring with officers of a national bank for the certification of checks by such officers when the drawer had no funds on deposit, in violation of Rev. St. § 5208 [U. S. Comp. St. 1901, p. 3497], it is not essential to conviction to prove that defendant had knowledge that such false certification was in violation of the statute; the necessary criminal intent being imputed where it is shown that the parties to the transaction acted with knowledge of the facts.

141 F.—15

**7. CRIMINAL LAW—NEW TRIAL—MISNOMER OF JUROR.**

It was within the discretion of the trial court to deny a motion for a new trial, based on the ground that the given name of one of the jurors who was accepted and sat on the trial was not the same as the name on the jury list which was drawn and called when the jury was impaneled; it being shown that the juror who served was the one summoned and actually intended, that he appeared in good faith, and that there was no person having the name on the list, which was so written through mistake.

**8. SAME—TRIAL—ARGUMENT OF COUNSEL.**

There, is a degree of liberty allowable to counsel in a criminal case, whether for the government or the accused, in respect to the line of argument they shall pursue and the inferences to be drawn from the evidence, which a trial judge should respect unless the facts of the case are overstepped or arguments used which plainly abuse the privilege, and a reviewing court should not reverse a judgment because of the refusal of the trial court to interfere with an argument of counsel, unless it was plainly unwarranted and so improper as to be clearly injurious to the accused.

**9. SAME—WAIVER OF OBJECTION.**

A defendant who deems himself prejudiced by language used by counsel in argument should promptly and publicly object and point out the language deemed improper, and then take exception if the trial judge fail to condemn it. Unless this is done, error cannot be predicated on the refusal of a trial judge to grant a new trial on account of such language.

**10. SAME—SENTENCE—CUMULATIVE TERMS OF IMPRISONMENT.**

Under convictions upon separate counts for distinct offenses of the same character judgment may be entered and sentence passed for a specified term of imprisonment upon each count, and the terms may be made consecutive and cumulative.

In Error to the District Court of the United States for the Northern District of Ohio.

The following is the full charge given by Taylor, District Judge, to the jury:

The testimony in this case having been completed, it now becomes my duty to define the law applicable to the facts given in evidence, and to instruct you as to the rules of law which you are to consider, and by which you are to be controlled, in weighing and construing the testimony. It is for you, and for you alone, to determine what the facts are. It is for the court, and the court alone, to define the law by which these facts are to be applied to the indictment in this case. If it should seem to you, at any time during this charge, that the court has an opinion respecting what may or may not be a fact in this case, you will still remember that the court's conclusion is in no sense to weigh with you, or control you, in your finding and determination of what the facts are. The Congress of the United States, from time to time, has seen fit to enact certain laws intended to aid in the honest and efficient administration of national banks. While it is not necessary that I should say anything to you respecting the need or the merit of any particular law passed for that purpose, yet I ought to say to you, and do say, that legislation of that general character is highly meritorious, and manifestly needful. We are so accustomed to repose confidence in banks, especially in those banks organized under federal laws, and, to a certain extent, supervised by federal officials, that, if stringent legislation looking to the protection of stockholders and depositors was not enacted and enforced, the property of innocent persons would be put in great jeopardy, and the confidence of the public in such institutions would be greatly impaired. No less important than this is the regard which the law has for the safety and liberty of individuals; and this is manifest when we consider the safeguards which it throws around those who are charged with crime. It is your duty to consider at once the necessity of enforcing the laws of the country and of giving full protection to persons charged with offenses against those laws. These considerations should cause

you to give most careful attention to your duties in this case, to the end that, on the one hand, if the defendant be guilty as charged, these salutary laws may be enforced; and, on the other hand, that she be not found guilty unless, by proof satisfactory to the law, you shall so find her.

The defendant in this case is presumed to be innocent until the contrary is proved; and this presumption, you will bear in mind, remains with the defendant as her right, until, upon all the testimony in the case, that presumption is overcome and her guilt is proved by testimony which satisfies you, beyond a reasonable doubt that she is so guilty. I will define further on in my charge what is meant by reasonable doubt. In the effort by Congress to bring about an honest administration of the laws regulating national banks, two acts, which now concern us, have been passed; and upon them, and what is known as the "conspiracy statute," this indictment has been based. These acts are section 5208, the act of July 12, 1882, and section 5440.

Section 5208 is as follows: "It shall be unlawful for any officer, clerk or agent of any national banking association to certify any check drawn upon the association unless the person or company drawing the check has on deposit with the association, at the time such check is certified, an amount of money equal to the amount specified in such check," etc. [U. S. Comp. St. 1901, p. 3497.]

Act July 12, 1882, c. 290, § 13, 22 Stat. 166 [U. S. Comp. St. 1901, p. 3497], is as follows: "That any officer, clerk or agent of any national-banking association who shall willfully violate the provisions of an act entitled 'An act in reference to certifying checks by national banks,' approved March third, eighteen hundred and sixty-nine, being section fifty-two hundred and eight of the Revised Statutes of the United States, or who shall resort to any device, or receive any fictitious obligation, direct or collateral, in order to evade the provisions thereof, or who shall certify checks before the amount thereof shall have been regularly entered to the credit of the dealer upon the books of the banking association, shall be deemed guilty of a misdemeanor, and shall, on conviction thereof," etc.

Section 5440 is as follows: "If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy all the parties to such conspiracy shall be liable to a penalty," etc. [U. S. Comp. St. 1901, p. 3676.]

The indictment in this case charges the defendant, in 16 counts, with violating section 5440, which I will call the "conspiracy statute," and charges this violation in two different forms—that is to say, 8 different checks are the subjects of this indictment, and as to each check conspiracy is charged against the defendant, first, in unlawfully conspiring with another to certify a check, by an officer of the bank, when an amount of money equal to the amount specified in the check was not on deposit to the credit of the person drawing the check; and, second, in unlawfully conspiring with another to certify a check, by an officer of the bank, before the amount of the check had been regularly entered upon the books of the bank to the credit of the drawer of the check. Counts numbered 1, 3, 5, 7, 9, 11, 13, and 15 make this charge respecting eight different checks that they were certified when funds were not on deposit; and the remaining counts 2, 4, 6, 8, 10, 12, 14, and 16 based upon the charge 'that the amount of the check had not been regularly entered upon the books of the bank to the credit of the maker. We thus see that the odd-numbered counts relate to the deposit of funds to the credit of the drawer, and the even-numbered counts relate to the regular entry, on the books of the bank, of the amounts of such deposits, to the credit of the drawer. To put it otherwise, the odd-numbered counts charge a conspiracy to commit the crime defined by the law which forbids the certification of a check unless the person drawing the check has on deposit with the bank, at the time the check is certified, an amount of money equal to the amount of the check; and the even-numbered counts charge a conspiracy to commit the crime defined in the act of July 12, 1882, which forbids the certification of a check before the amount thereof shall have been regularly entered to the credit of the drawer of the check.

I trust, gentlemen of the jury, that you will not handicap your free consid-

eration of this case by any apprehension that it will be difficult for you to understand it, or to apply the facts as you find them to the law as I shall give it to you. I think that you understand the case, and, if you do not, I am sure that it will be clear to you when such additional light as is needed is given to you by this charge. You must remember that you are to look at the facts, and apply the law to them as given you by the court, exactly as you would look at other important concerns affecting yourselves. You should approach the consideration of the whole case with a confidence that you will arrive at a conclusion satisfactory to your judgment and your conscience, precisely as you are satisfied that you will arrive at a like conclusion in any important matter of your own, after you have given to it full and careful consideration.

There are no distinctions to be drawn in this case so fine that the ordinary mind cannot apprehend them, nor are there any mysterious processes, either of reasoning or of legal procedure, which you need fear will cloud your inquiry, or interfere with your arriving at a perfectly intelligent conclusion. The questions here are practical questions for you to decide, and all that is needed is that you give your very best attention to their consideration. Let me impress upon you, at the outset, that the defendant in this case is presumed to be innocent until her guilt is established by proof which satisfies you, beyond a reasonable doubt, that she is guilty. This presumption abides with her all through the case, until it is, as I have said, removed by the proof; and every material element necessary to make up the crime of conspiracy in this case must be established by like proof, satisfying you, beyond a reasonable doubt, of its existence.

A reasonable doubt is not mere possible doubt, because everything relating to human affairs, and depending upon moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after full consideration of all the evidence, leaves the minds of the jurors in such a condition that they cannot say that they feel an abiding conviction, to a moral certainty, of the truth of the charge. Every person is presumed to be innocent until he is proved guilty. If, upon such proof, there is reasonable doubt remaining, the defendant is entitled to the benefit of it by acquittal. It is not sufficient to establish a probability, though a strong one, that the fact charged is more likely to be true than otherwise, but the evidence must establish the truth of the fact to a reasonable and moral certainty—a certainty that convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it.

I am asked by the defendant to charge, and I do charge, that, in order to find the defendant guilty, "the evidence must be such as to exclude every single reasonable hypothesis, except that of the guilt of the defendant. In other words, all of the facts proved must be consistent with, and point to, the guilt of the defendant, not only, but the facts must be inconsistent with her innocence." And this, also, I charge at the request of the defendant. It matters not how clearly the circumstances point to guilt, still, if they are reasonably explainable on a theory which excludes guilt, then it cannot be said that the facts in the case are sufficient to satisfy the jury, beyond a reasonable doubt, of the guilt of the defendant, and in that event she should be acquitted. I am asked by the defendant to charge the following: "If, after consideration of the whole case, any one of the jury should entertain a reasonable doubt of the guilt of the defendant, it is the duty of such juror not to vote for a verdict of guilty." I give you that charge, with this additional injunction; that if, after a consideration of the whole case, fully, carefully, and honestly made after comparison with his fellow jurors with a view of arriving at an honest conclusion, still one of the jury should entertain a reasonable doubt of the guilt of the defendant, it would then be the duty of such juror not to vote for a verdict of guilty.

I will proceed now to define to you the several acts which the law forbids, and of which the government claims the defendant was guilty.

The usual business carried on by banks is to receive moneys on deposit from persons who desire a safe place to keep their funds, and a convenient place from which they can, when needed, be withdrawn, and to loan money to persons who desire to borrow it. According to the usual custom of such banks,

of which the Citizens' National Bank of Oberlin was a type, the money deposited by a customer of the bank would be entered to his credit, and when the depositor desired to withdraw from the bank any or all of the funds so deposited and carried to his credit, he would draw an order on the bank for the amount of money desired. This order is commonly called a check.

In the transaction of the business of a bank, and in the transaction of the business of a depositor, it sometimes becomes desirable that the depositor, in addition to drawing this order or check against the fund to his credit in the bank, desires that the person to whom the check may be delivered shall be authoritatively advised and informed by the bank that the depositor has to his credit in the bank an amount of money equal to the amount of the check which he thus draws. This act of authoritative information that the maker of the check has such funds to his credit in the bank is, according to the custom of banks, usually evidenced by an indorsement on the face of the check, signed by some competent officer of the bank, declaring that the check is good. This proceeding is called the certification, or certifying, of the check, and operates to add to the liability of the maker of the check for its amount the liability of the bank for a like amount, for it is a contractual assurance by the bank that funds to that amount are on deposit in the bank to the credit of the maker, and that the bank will hold such funds, equalling the amount of the check, to be used solely for the satisfaction and payment of the check. If, therefore, an officer of the bank thus certifies a check drawn by one of its customers, or by one who is not a depositor in the bank, when the person who draws the check does not have to his credit in the bank the amount for which the check was drawn, an obligation or liability is created against the bank which may injuriously affect the interests of the other depositors and the stockholders of the bank. Thus we see the reason of the statute which declares unlawful the certification of a check when the person drawing the check does not have on deposit with the bank, at the time the check is so certified, an amount of money equal to the amount specified in the bank. But legislation on this subject has not stopped with the prohibition against certifying checks when there is not a sufficient amount to meet the check on deposit to the credit of the drawer thereof. It has gone further, and declared to be unlawful the certification of a check before the amount thereof has been regularly entered to the credit of the maker of the check. The purpose of this prohibition is to compel full compliance with the requirements of safe banking methods, and to make it necessary, in order that the law may not be violated, that a check drawn against an account be not certified until, in the usual and regular way, the account of the drawer of the check has been credited with an amount equal, at least, to the amount of the check so drawn.

Now, these two offenses, in the nature of things, can be committed only by the officers of the bank. No certification of a check can be made, except by some official of the bank whose signature, attached to the certificate, implies to the holder of the check that the bank itself is back of the certificate; and it follows, from what I have said, that the defendant in this case could not be guilty of the penal offense of certifying a check under either of the two conditions which in this indictment make such certification of a check unlawful. But she is indicted, as I have before stated to you, under section 5440, which provides that if two or more persons conspire to commit an offense against the United States, and one or more of such parties do any act to effect the object of the conspiracy, all of the parties to such conspiracy shall be liable. I say to you that although the defendant could not, as I have heretofore indicated, be indicted or successfully prosecuted for unlawfully certifying a check, she can be indicted and successfully prosecuted, if the facts warrant, for a violation of section 5440, in conspiring with a person who may, under the law, be capable of committing the offense of unlawfully certifying a check. But I say to you, in this connection, that the defendant could not be found guilty under any count in this indictment, except upon proof of such a state of facts as would justify you in finding guilty, on such count, the person with whom she is charged with conspiring, if such person were also made a party defendant in this indictment.

It becomes important now for me to define a conspiracy, as that word must

be defined under section 5440. A conspiracy, in criminal law, as applied to the charge in this case, is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose. To constitute a conspiracy, it is not necessary that two or more persons should meet together, and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, in words or in writing, state what the unlawful scheme is to be, and the details of the plan or means by which the unlawful combination is to be made effective. It is sufficient if two or more persons, in any manner, or through any contrivance, passively or tacitly, come to a mutual understanding to accomplish the combination and unlawful design. In other words, where an unlawful end is sought to be effected, and two or more persons, actuated by a common purpose of accomplishing that end, work together in any way in furtherance of the unlawful scheme, such persons become conspirators. In this case it is enough if, as the result of separate negotiations, at the same or different times and places, an arrangement was made such as is set out in any one of the counts of the indictment, and some act in furtherance of such arrangement, and specified in that count, was done by one of the parties to such arrangement. If, therefore, you find from the evidence such facts as warrant the inference that such arrangement as I have defined was made by the defendant with either of the parties with whom she is charged with conspiring, and that the act charged as being done in furtherance of such arrangement was performed by either one of the parties so charged with conspiring, it will be your duty to return a verdict of guilty against the defendant as to such count or counts of the indictment in respect to which you find such facts, if you should so find them.

I am requested by the government to charge, and I do charge, as follows: The jury is instructed that a conspiracy can seldom be proved by direct testimony. Persons combining for the execution of a crime do not ordinarily expose themselves to public observation, and the fact of combination can, therefore, as a general rule, be established only by proof of the acts of the several parties in such combination, the relation of these acts to each other, and their tendency, by united effect, to produce the common result. In other words, where the jury finds that the acts of the several parties charged with conspiracy are the co-ordinates of each other, and are for the consummation of the criminal purpose charged in the indictment as the object of the conspiracy, they are at liberty to find that the various parties performing these several and respective acts were engaged in a conspiracy to commit the offense, although there may be no direct evidence whatever before the jury to show that such parties ever entered into any agreement to commit such offense.

And I am asked by the defendant to charge on this subject, and do charge, that it is incumbent on the government to prove the conspiracy which it claims to have existed between the defendant and the person or persons named in the respective counts of the indictment beyond a reasonable doubt, and if, on careful consideration of all of the competent evidence which has been received in this case, you have any such doubt, it is your duty to resolve such doubt in favor of the defendant.

I am asked by the government to charge, and I do charge, in this connection, that the jury is instructed, on the question of intent on the part of the defendant, that the law presumes that every person intends the natural and ordinary consequences of his acts. Wrongful acts, knowingly or intentionally committed, cannot be justified on the ground of innocent intent. Ordinarily the intent with which a man does a criminal act is not proclaimed by him, and ordinarily there is no direct evidence from which the jury may be satisfied, from declarations of the criminal himself as to what he intended when he did a certain act. And this question of intent, like all other questions of fact, is solely for the jury to determine from the evidence in the case. Generally, upon this subject of conspiracy, I instruct you that it is competent for you to consider all of the facts developed in the case for the purpose of answering the question as to whether or not a conspiracy was in fact entered into between the parties named in the indictment.

I am asked by the defendant to charge, and I do charge, that the defendant is to be tried on the indictment in this case, and on that alone. It would make

no difference if she had committed a multitude of other crimes. If she had not committed the crime of conspiracy, as set forth in this indictment, it will be your duty to acquit her in this case.

The claim is made by counsel for the defendant that there is no proof that the defendant had knowledge that the act of certifying the check, if done as claimed in the indictment, was in violation of the law. On this point, I say to you, gentlemen, that a conspiracy cannot exist without a guilty intent being then present in the minds of the conspirators; but this does not mean that the parties must know that they are violating the statutes of the United States. The government is not required to prove, in order to sustain a verdict of guilty, that the parties knew that some statute forbade the acts they were performing. If these acts of certifying checks, or any of them, as charged in the indictment, were in fact violations of the law, the defendant is to be held guilty if she, as charged in the indictment, conspired with Beckwith or Spear in bringing about their certification; and the question of her knowledge or her ignorance of such acts being contrary to law is not a fact which you have a right to consider. The only question for you to pass upon is whether the defendant violated the law; not whether she had any knowledge that she was violating the law.

Applying the definition of conspiracy to this case, I say to you that, in order to convict the defendant on any of the counts of the indictment, it must be shown by the evidence, beyond a reasonable doubt, that she conspired with either Beckwith or Spear to procure the certification of her check by one or the other at a time when both he and she knew that she had not funds to her credit in the Citizens' National Bank of Oberlin, at least equal to the amount of the check so certified; and, of course, if Beckwith and the defendant did so conspire, and the check described in the first count was so certified by him, and if Spear and the defendant did so conspire and the checks described in the third, fifth, seventh, ninth, eleventh, and fifteenth counts were so certified by Spear, then the defendant would be guilty on all seven of the counts just referred to; that is, the seven odd-numbered counts now before you for consideration. Now, in order for the defendant and Beckwith or the defendant and Spear to be guilty of such conspiracy, two things must have occurred: First, they must have agreed that Beckwith or Spear should do the unlawful thing charged in the indictment, to wit, certify her check when she did not have on deposit to her credit in the bank funds equal to the amount of the check so to be certified; and, second, one of them must have done some act in furtherance of the conspiracy—in this case the act charged as having been so done in furtherance of the conspiracy was the certification of the check. In order to enter into such unlawful conspiracy, it is not necessary that you should find that the parties, in set words or in any formal way, made a plan which either or both recognized was in violation of the law. It will be enough if you find that, by mutual concert of purpose, the plan came into existence, by which it was understood by both of them that the act of certifying the check was to be done when the defendant had not funds on deposit equal to the amount of the check. I have eliminated, you will recall, the thirteenth count of the indictment—that was the check which was dated in February, and marked at the bottom "payable March 1st," so that there are seven of the odd-numbered counts only, referred to by me in this charge.

Two facts are admitted, or at least they are not denied: First, that the seven checks were drawn by the defendant on the Citizens' National Bank of Oberlin; and, second, that they were certified, one by Beckwith and six by Spear. So, that, if the conspiracies charged in the indictment were entered into, the act which completed the crime was committed, if that act itself was a crime; and, if it was a crime committed by Beckwith or Spear, then the defendant was guilty of conspiracy as charged in the indictment, although she, not being an officer of the bank, could not herself commit the crime of unlawfully certifying a check. This question as to whether or not there was such a conspiracy as charged in the indictment, and as defined by me, you are to answer under all the evidence in the case. You should consider the relations between the parties, their acquaintance, whether intimate or otherwise, the opportunities for such acquaintance, and the reasons, if any there were, for

the manner in which they transacted their business together. If there was any secrecy about their transactions, you should consider whether that secrecy was such as persons engaged in large business transactions are likely to maintain, or naturally and rightfully adopt. Persons have a right to keep their business affairs to themselves. Whether the conduct of the parties to these transactions was such as is naturally referrable to such rightful secrecy is for you to say.

The government claims that at the several times these several checks, respectively, were certified, the defendant did not have to her credit in the bank funds equal to the amount of the checks so certified. I say to you that, so far as this particular branch of the case is concerned, if the defendant, at the time when any of these checks were certified, had a deposit, or had an actual credit, in the bank in an amount equal to the check, whether regularly entered as a deposit to the credit of her account or not, she would not be guilty as to the count of the indictment which was predicated on that check. Now, if you are satisfied that the conspiracy was formed, as charged in the indictment or in any of the counts thereof, and in answering this question you are, as I have said, to consider all of the evidence in the case bearing on it, you will further say whether or not any or all of these checks were unlawfully certified by Beckwith or Spear. The government claims that it has proved that, at the time when the checks were certified, there were not funds sufficient in the bank to the credit of the defendant to meet them. Whether this claim is or is not sustained is for you to say.

The defendant insists that the proof does not support the claim of the government in this respect. You have heard the evidence, the books of the bank have been presented before you, the witnesses for the government have testified as to what they did and what they did not find in them respecting the defendant's credits and deposits at the times when the checks were drawn, the defendant has had access to these books, and her accountant has examined them and has testified concerning them. It is for you to say whether the books do or do not show that she had such credits. It is fair to presume, under all the circumstances disclosed to you, that both sides have presented to you all that the books contain favoring their respective contentions, and it is for you to say what the facts and just inferences are. In respect to proof of the claim of the government that the defendant, at certain times, had not sufficient funds to meet her several checks, the evidence must necessarily be of a negative character. That is, the witnesses cannot point to some particular entry to support their statements. They can only declare how careful was their search, and that they did not find evidence of such funds being, at the times in question, in the bank to the credit of the defendant.

Evidence was introduced showing that the defendant executed a number of notes, aggregating $104,000, to the Citizens' National Bank of Oberlin, all dated August 24, 1903, and payable on demand, and that of these notes, two, aggregating $15,000, were first entered on the journal of the bank under date of November 3, 1903, and were given the proper serial numbers as of that date. The evidence does not disclose that the residue of the notes were ever entered on the books of the bank, unless they were so entered January 29, 1904, the date of the cancellation stamp on the face of the notes. Nor did these notes, other than the two for $15,000, have any serial or discount number such as appears on the notes for $15,000. The evidence also shows that on August 24, 1903, the bank issued to the defendant two New York drafts, aggregating $80,000, and a certified check for $12,500, which is the certified check upon which the third and fourth counts of the indictment are based, and that no entry of these drafts for $80,000 was made on the books of the bank until September 29th. These are all facts proper for you to consider in determining what your duty is in this case, and determining whether or not Mrs. Chadwick had credit to her account in the bank on August 24, 1903; and it is proper for you to consider them, in connection with all the other circumstances in the case, for the purpose of throwing light on the question as to whether or not a conspiracy was entered into between Mrs. Chadwick and Beckwith and Spear.

The first and second counts in the indictment relate to the check certified

by Beckwith; and the evidence concerning that check differs somewhat, at least in the details of the certification, from that touching the other checks referred to in the indictment. Doubtless you remember the substance of all of it. It is for you to say, considering that evidence and construing it in the light of this charge, whether or not the defendant and Beckwith formed the intention, and by mutual concert arranged, to have that check certified, knowing that there were not, at that time, funds in the bank to her credit in an amount equal to the amount of the check. If they did so, then the defendant was guilty of the charge made in the first count. Two papers, purporting on their face to be letters from the defendant, one to Spear and Beckwith and one to Spear, have been offered in evidence; a witness having testified that they are in the defendant's handwriting. The direct evidence is silent as to whether they were ever received by Beckwith or Spear; but, if you find that they are in the handwriting of the defendant, you will give to them such interpretation and force as, under all the surrounding circumstances, you think them fairly entitled to. They may, if in your judgment they are entitled to such an interpretation, furnish some information as to the kind of transactions carried on between the defendant and Beckwith and Spear, and whether the relation which she and they sustained to the bank were such as to tend to support the contention of the government that the defendant and Spear and Beckwith were engaged in a conspiracy to violate the law respecting the certification of checks. I have thus far, in my reference to the charges and the evidence, referred chiefly to the odd-numbered counts. The even-numbered counts relate, as I have already said, to the certification of checks when the amount to the credit of the drawer of the check was not regularly entered to the credit of the person making the check. This, you will note, is a very different charge from the other, and may be made, although as a matter of fact the drawer of the check has to his credit funds sufficient to meet the check.. It may well be doubted whether, in any but very exceptional cases, the drawer of the check, if he be not an officer of the bank, could know whether the books of the bank were properly kept, however full his knowledge might be that he was entitled to credit in the bank. I am unable to discern any testimony in this case tending to show that the defendant conspired with either Beckwith or Spear to have her checks certified when the amount to her credit was not regularly entered on the books of the bank. It is true that if she had no funds to her credit, and, in that state of her account, she conspired with Beckwith or Spear to have her checks certified, she must have known that no regular entry could be made on the books of the bank of that which had no existence at all. Yet I do not think that the statute was meant to meet such a case. You will therefore disregard the even-numbered counts; or, rather, as I have already, during the course of the trial, instructed you respecting counts 13 and 14, you will return a verdict of not guilty as to counts 2, 4, 6, 8, 10, 12, 13, 14, and 16. You will consider in your juryroom counts 1, 3, 5, 7, 9, 11, and 15, and determine whether, under any or all of them, the defendant is guilty; and that you will not do, unless you are satisfied of her guilt beyond a reasonable doubt.

Gentlemen of the jury, it is not for you to consider the consequences of your verdict, whether it be guilty or otherwise. You are here solely to try the case which has been presented to you from the witness stand, under the direction of the court. It is proper for counsel to present to you their reasons, on the one side or the other, advising and urging the return by you of a certain verdict. This is a wise and proper method of instructing the jury and aiding it in arriving at a conclusion; but you will not consider statements of counsel as facts bearing upon the case, except in so far as the testimony given from the witness stand supports such statements. Reference has been made, especially by counsel for the defendant, to what is called popular clamor or public demand. The court has no fear that you gentlemen will be moved by any consideration, except a determination to do justice between the government on the one side and the defendant on the other, according to the law and the evidence and according to them alone. The court does not fear that public clamor, either one way or the other, will move you to your conclusion. Yet I ought to say to you that it is well, since the subject has been adverted to, that you should guard yourselves against the danger of being moved to bring in a

certain verdict because popular clamor or public sentiment may be thought to be favoring it, or, on the other hand, because of such public clamor for one verdict, to undertake to bring in another verdict. You are not to be influenced by such a thing either way. The defendant is entitled to the best consideration you can give to the testimony in the case. You must appreciate, as intelligent and conscientious men, that the only commendation worth having is that which comes when a satisfied conscience and an intelligent self-respect proclaim that you have done right.

You may find the defendant guilty as to each of the seven counts in the indictment which I have submitted to you, if, under the proof, you are satisfied, beyond a reasonable doubt, that she is so guilty; or you may convict her as to one or some of the counts, according as the testimony may satisfy you, beyond a reasonable doubt; or, if the evidence does not satisfy you, beyond a reasonable doubt, that she is guilty of any one of the charges set out in the indictment, then you should return a verdict of not guilty. So you will observe, gentlemen, that your verdict may be one of three forms: either guilty as she stands charged in the first, third, fifth, seventh, ninth, eleventh, and fifteenth counts of the indictment; or guilty as she stands charged in one or more of those seven counts of the indictment, naming them, and not guilty as to the remaining counts; or not guilty.

Francis J. Wing, S. Q. Kerruish, and Jay P. Dawley, for plaintiff in error.

John J. Sullivan, U. S. Atty., and Thos. H. Garry, Asst. U. S. Atty.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. The plaintiff in error, Mrs. Cassie L. Chadwick, was indicted under section 5400, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3656], for conspiring with other persons to violate section 5208, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3497]. Excluding the counts withdrawn from the consideration of the jury, she was indicted and convicted upon seven separate counts. One of these charged her with conspiring with C. T. Beckwith, president of the Citizens' National Bank of Oberlin, Ohio, a national banking association, organized under the laws of the United States and then carrying on a banking business at Oberlin, Ohio, to commit an offense against the United States, to wit, to violate section 5208 of the Revised Statutes of the United States, by unlawfully and willfully certifying a certain check, drawn upon the said bank by the said Cassie L. Chadwick for the sum of $15,000 at a time when the said Cassie L. Chadwick would not have on deposit with the said bank an amount of money equal to the amount so to be specified in such check. The other counts charged separate conspiracies with A. T. Spear, cashier of the same bank, to violate the same section of the Revised Statutes by the unlawful certification of six other checks to be drawn against the same bank and certified at a time when the drawer had no funds on deposit. The judgment of the court was upon each of the seven counts, and that the term of imprisonment under each should be successive and cumulative, the punishment under one count to begin when that under the preceeding count should end. Many errors have been assigned. These will be taken up in groups rather than singly, and in such order as shall seem most convenient.

1. A motion to quash the indictment upon the ground of the admission before the grand jury of a statement made by C. T. Beckwith,

one of the persons with whom the plaintiff is charged to have conspired, the statement, as recited in the motion, consisting in a narration or confession made by Beckwith, in absence of Mrs. Chadwick and after her arrest, upon the charges embraced in the indictment and not in furtherance of any alleged conspiracy. The motion itself was reduced to writing, and recites, in a general way, the nature of the alleged illegal evidence so alleged to have been submitted to the grand jury as evidence for their consideration upon the indictment sought against Mrs. Chadwick, and is sworn to by her. This motion and affidavit is insufficient upon its face. It does not aver that the grand jury had before it no other evidence than that alleged to have been incompetent; but only that the grand jury heard and received the alleged hearsay declarations of C. T. Beckwith. We are aware of no rule of law which would nullify the action of a grand jury merely because as a part of the case they received improper or incompetent evidence. We are not prepared to say that an indictment found wholly upon illegal evidence would not be as invalid as one based upon no evidence at all, the matter not being one which may be found exclusively upon the knowledge of the grand jurors. 10 Ency. Pl. & Pr. 395; People v. Brickner (O. & T.) 15 N. Y. Supp. 528; U. S. v. Coolidge, 2 Gall. 364, Fed. Cas. No. 14,-858. But an inquiry into the weight of the evidence upon which a grand jury acted is quite irrelevant and incompatible with the secrecy which should protect the ordinary conduct of such an inquisitorial body. The mere fact that illegal evidence was heard, if there was any substantial competent evidence upon which that body might lawfully base their indictment and a motion and affidavit based upon an allegation that the grand jury received and considered an alleged statement, narrative, or confession which was in the nature of hearsay evidence, is not enough to justify the setting aside of an indictment in the absence of averment or evidence that the objectionable evidence was the only evidence material to the subject. Hope v. People, 83 N. Y. 418, 38 Am. Rep. 460; Bloomer v. State, 3 Sneed, 69; State v. Tucker, 20 Iowa, 508; State v. Logan, 1 Nev. 509; People v. Lauder, 82 Mich. 115, 46 N. W. 956; Jones v. State, 81 Ala. 79, 1 South, 32; State v. Bunger, 14 La. Ann. 465.

But another and equally fatal objection is that in general a motion to quash is addressed to the sound discretion of the trial judge, and is not the subject of exception. U. S. v. Rosenberg, 7 Wall, 580, 19 L. Ed. 263; Logan v. U. S., 144 U. S. 268, 282, 12 Sup. Ct. 617, 36 L. Ed. 429. This motion, it appears from a journal entry, came on to be heard upon affidavits, and upon a consideration thereof this entry recites that the court found and decided that the alleged confession of C. T. Beckwith was not used by the grand jury while considering the indictment preferred against Mrs. Chadwick, nor treated or received as evidence upon which they might act, but was read to the members of the jury after the finding of the indictment by one of their number as a matter of curiosity. The evidence thus submitted to the court upon this motion has not been made a part of the bill of exceptions, and we must accept the ruling of the court as not reviewable.

2. In many ways it was insisted that the indictment charged no

offense because it was said Mrs., Chadwick was not an agent or officer
of the Oberlin bank, and was therefore legally incapable of certifying
the check of a drawer when there was no money on deposit to meet
such check.    Upon this assumption it is insisted that she could not be
legally punished for conspiring with another who was capable of do-
ing the act which she could not do.    Subject to the limitation that the
object of the conspiracy must be to violate some law of the United
States, and that some overt act must be done "by one or more of such
parties" to carry out the agreement, we can discover no distinction be-
tween a conspiracy indictable at the common law and one cognizable
under section 5400, Rev. St.    There are certain offenses in which a
concert of action between two persons is logically necessary to the
completion of the crime; that is, crime which cannot take place without
concert.    Among such kind of offenses Mr. Wharton mentions adul-
tery, bigamy, incest, and dueling.    "Therefore," says Mr. Wharton,
"when to the idea of an offense plurality of agents is logically neces-
sary, conspiracy, which assumes the voluntary accession of a person
to a crime of such a character as that it is aggravated by a plurality of
agents, cannot be maintained.    * * *    We have," he says, "the
well-known distinction between concursus necessarius and concursus
facultativus—in the latter of which the accession of a second agent to
the offense is an element added to its conception; in the former of
which the participation of two agents is essential to its conception; and
from this it follows that conspiracy, the gist of which is combination,
added to crime, does not lie for concursus necessarius."    2 Wharton
Crim. Law, § 1339.

The case of United States v. Deitrich (C. C.) 126 Fed. 664, has
been much cited and relied upon by the counsel for Mrs. Chadwick.

The case affords an illustration of the proper application of the
principle referred to by Mr. Wharton, and is broadly distinguishable
from that now under consideration.    Senator Deitrich, of Nebraska,
and Jacob Fisher, were indicted under section 5400 for conspiring to
violate section 1781, Rev. St. by the said Dietrich, being a senator in
the Congress, agreeing, corruptly and unlawfully, to receive a bribe
for aiding and procuring the appointment of the said Fisher as Post-
master, and the said Jacob Fisher by corruptly and unlawfully agree-
ing to give to Dietrich a bribe for procuring and aiding to procure his
appointment to said office of Postmaster.    The concurrent acts of two
persons were essential to the offense which it was the object of the
conspiracy to commit.    Dietrich could not agree to receive a bribe un-
less some other should agree to give him one.    Under section 1781,
Rev. St. [U. S. Comp. St. 1901, p. 1212], the act of "agreeing" to re-
ceive such a bribe was a substantive offense, and the act of agreeing
to give such a bribe another.    Concert of action was, therefore, essen-
tial to the violation of section 1781, charged as the purpose of the
conspiracy.

To violate section 5208, a plurality of guilty agents is not necessary.
A check may be certified when the drawer has no funds upon deposit,
and the officer certifying it be guilty of violating the law which for-
bids that act without the guilty complicity of the drawer or any other

person. In short, the very fact that Mrs. Chadwick could not be guilty of any violation of section 5208, as contended by her counsel, takes the case outside of the rule which forbids an indictment for conspiracy where a plurality of agents is logically necessary to complete the crime which it was the object of the conspiracy to commit. It is sufficient if any one of the parties to a conspiracy is legally capable of committing the offense, although the other parties may not have been. Scott v. U. S., 130 Fed. 429, 64 C. C. A. 631; 2 Wharton, Cr. Law, §§ 1340a and 1388; 1 Bishop, Cr. Law, 627–629, and § 432; U. S. v. Bayer, 4 Dill. 407, Fed. Cas. No. 14,547; State v. Sprague, 4 R. I. 257; Boggus v. State, 34 Ga. 275. In Scott v. U. S. cited above, the conspiracy was to violate section 5209 [U. S. Comp. St. 1901, p. 3497] by causing certain false entries to be made upon the books of the bank. Only one of the conspirators was an officer of the bank. The overt act charged was the making of the false entries by the hand of the defendant, who was not an agent, servant, employé, or officer of the bank. But it was also averred that both defendants participated in the act and that the entries were in law made by the bank officer through the hand of another—his co-conspirator. This court held the indictment good. The errors assigned to the present indictment based upon the objection we have been considering are not well taken.

3. Where two or more criminal acts are connected together, or are transactions of the same class of crime or offense, they may be joined in one indictment in separate counts, instead of having several indictments. Rev. St. § 1024 [U. S. Comp. St. 1901, p. 720]. When this is done, the court, if it sees that the defense of the accused may be seriously embarrassed, may require the government to elect upon which of the counts it will proceed. But, even when there is a joinder of felonies, the court is not under any absolute duty to require an election upon motion of the defendant. This question of election must depend upon the circumstances of the particular case, and is one requiring the exercise of a considerable degree of discretion by the trial judge. If it does not appear that any substantial right of the defendant may be prejudiced by the submission to the same jury of more than one distinct accusation according to the orderly methods of a court of justice, it should not compel an election and thus cause repeated trials of offenses of the same class. Pointer v. U. S., 151 U. S. 396, 14 Sup. Ct. 410, 38 L. Ed. 208. There was no error in the joinder of the several offenses charged in this indictment. They were crimes of the same class, and the evidence relating to each substantially the same.

We do not see from anything which appears in this case that the plaintiff in error was prejudiced or embarrassed by the trial of the several counts before the same jury. There was no error in denying the motion to elect.

4. Mrs. Chadwick's letters. Two letters were offered in evidence by the district attorney upon evidence that they were in the handwriting of Mrs. Chadwick. They were received over the objection of the defendant. Subsequently a motion to take them from the jury was denied. These letters were as follows:

"Cleveland, October 2, 1903.

"My Dear Mr. Spear and Beckwith: I must again thank you and Mr. B. for your great kindness to—I gave the check to Mr. Fay, and he said he would go and see his people to-morrow morning, and if they would extend the paper he would give me my note. I just said, a deal that would go through your bank in connection with the college. The check was given in that connection. So you need only to listen to him. I don't think he will ask any questions. I don't want him to be in possession of any facts, rather I don't want Mr. Wurst to be. I think best not to. It will only be necessary for you to say that you will renew the paper. He said he was going to take the check up and show it to you, and ask you to renew their paper on the strength of the check not being payable before November 1st. Hoping this will pass of all safe, and with many thanks to you both.

"Very gratefully,                                    C. L. Chadwick."

"P. S. He is going first thing in the a. m. He remarked that you would be surprised to see the check in his hands, so you better be surprised; if you do not say it, look it."

"My Dear Mr. Spear: Could we arrange this matter of Mr. W. and F. in this way: They don't even know that I have ever met you or done any business with you. I think I might say I was going to make a loan through your bank in connection with the college. Now, this he would not repeat because he wants to act for me in every way he can in the future. I would not tell him anything that would ever show that we had ever done any business. I would ask you to certify my check dated October 10th, and this would get the matter out of their hands. I could then get the funds on the goods in the East to meet the check and you would not be anything out, so if you will draw the check for $15,000 and certify it on your checks I can sign it, and he will be none the wiser. Now I will pay you and Mr. B. well for this favor, and am sure it will be safe, and you need not let them know anything about our matters. There will be nothing for your folks to say, only that the check will be good on that date. And if they ask you for extension for ten days, you can agree to it, and do hope you can do this. Please do not be afraid to do this, because I will be most careful over this. I think by advice of my attorney I am myself going to be able to do something which will be of great interest to us all. He will prepare the papers to-day. I was sick and did not get it arranged yesterday. I send you also my note dated to cover certified check for the 10th, and a small commission, for your kindness. Please phone me if you can do this, it is important. If you do this I save, what I give you.

"Very truly,                                         C. L. C.

"Postscript. I mean that I will tell them that I had a deed with the college that will pass through your bank, which is true for I have had, and if they help me further then it will be through you.

"Yours,                                              B."

There was no direct evidence that these letters were ever sent to or received by either Beckwith or Spear. Beckwith was president, and Spear cashier, of the Citizens' National Bank at Oberlin, Ohio, and are the same persons with whom Mrs. Chadwick is charged to have conspired to violate section 5208, Rev. St., by certifying her checks drawn upon that bank at a time when she should have no money upon deposit to meet same. It is now very earnestly insisted that, in the absence of evidence of transmission or delivery, such documents are not competent as either confessions or admissions, not being declarations made to another. Soliloquy, say counsel, cannot prejudice the speaker, because there is no vilification of one's self when not said or written to another. But a self-charging admission does not lose all of its evidential force because it is not transmitted or delivered to another. Books of account afford evidence against all who

· are instrumental in their being kept or have right of access to them, although intended only for the inspection of those who make them. It is true that in respect of such books of account the case is somewhat different from that presented by an admission in a private diary or an unsent letter or a memorandum intended only for the personal use of the maker. The custom and usage of merchants has made the keeping of correct books of account a matter of business necessity, and the presumption of correctness of entries perhaps extends beyond those which are self-charging. The bottom principle is, however, the same in each instance, namely, that one will not write or say that which is contrary to one's interest, unless it be true. To put it in another form, that which one admits to be true, whether in the privacy of his private journal or by a memorandum intended to aid his own memory only or in a letter which he keeps, instead of transmitting to the one addressed, may reasonably be presumed to be true until explained or rebutted. That this kind of an admission would not be conclusive, not being intended to influence the conduct of another, but subject to explanation, does not affect its admissibility as evidence of the truth of any admissions made by the author of the document or utterance.

In Toner v. Taggart, 5 Bin. (Pa.) 490, a memorandum in handwriting of deceased and found upon his person after death was held admissible as an admission of the indebtedness of the deceased to the plaintiff. In Medway v. U. S., 6 C. Cl. (U. S.) 421, the issue was as to the loyalty of Mrs. Medway. A letter written by her and addressed to Mr. Davis, president of the Southern Confederacy, but never sent, was held admissible. The letter, never having been transmitted, was held not to be an overt act of aid and comfort to the cause of the Confederacy. But it contained an admission that the writer had theretofore written and transmitted a similar letter tendering aid and comfort to Mr. Davis in his official character, and this admission was regarded as an admission that Mrs. Medway had theretofore, by the writing and transmission of such letter, aided, comforted, and abetted the Rebellion. In People v. Robinson, 19 Cal. 40, the talk of a person in his sleep was held very properly to be inadmissible as evidence against him upon the ground of unconsciousness. But in State v. Morgan, 35 W. Va. 260, 266, 13 S. E. 385, the ejaculations or soliloquy of a woman charged with murder, made in the nighttime while upon her couch, were held competent as admissions. The question as to their value was left to the jury.

Upon this subject Brannon, J., said:

"It is with them to say whether it was made in sleep and was therefore worthless, or whether, though in sleep, it was but the divulgence of truth, springing from guilt which rested heavy upon the soul and broke forth through voice and lips, the half conscious man revealing secrets indelibly impressed on the memory, which if fully awake, he would fain have suppressed. It was with the jury to say whether she was fully awake, and forgot herself, and in this soliloquy spoke out the truth. The operation of the human mind is an enigma, and its expressions in the unconsciousness of sleep are frequently vagaries and fictions, but sometimes born of reality."

If from other evidence the jury should be satisfied that there was a conspiracy to which either Beckwith or Spear were parties to bring about the violation of section 5208, Rev. St., by the unlawful certification of Mrs. Chadwick's checks, these letters would tend to show that she was a party to such conspiracy. A general objection to their competency or evidence or a general motion to withdraw them from the jury would be manifestly bad. The extent to which they were competent will now be considered under an exception taken to the charge of the court relating to the matter. Upon the evidential character of these letters the court said in its charge:

"Two papers, purporting to their face to be letters from the defendant, one to Spear and Beckwith, and one to Spear, have been offered in evidence; a witness having testified that they are in the defendant's handwriting. The direct evidence is silent as to whether they were ever received by Beckwith or Spear; but, if you find that they are in the handwriting of the defendant, you will give to them such interpretation and force, as under all the surrounding circumstances, you think them fairly entitled to. They may, if in your judgment they are entitled to such an interpretation, furnish some information as to the kinds of transactions carried on between the defendant and Beckwith and Spear, and whether the relation which she and they sustained to the bank were such as to tend to support the contention of the government that the defendant and Spear and Beckwith were engaged in a conspiracy to violate the law respecting the certification of checks."

This was duly excepted to, but no request for any charge in respect of these letters was made, except a request that the letters should be withdrawn from the jury as incompetent for any purpose. The undated letter addressed to Mr. Spear was inferably written before the one dated October 2, 1903. That it refers to a check of October 10th, which she wishes certified, is not significant that its date was after October 10th, for her reference is most likely to a check dated ahead or to be dated ahead. A check for $15,000, dated November 1, 1903, payable to order of Henry Wurst and indorsed to W. L. Fay, is in evidence. This check was certified October 2, 1903, and is stamped paid November 1, 1903. This is evidently one of the checks referred to in both letters; that of October 2d acknowledging receipt of the certified check and showing that she had given it to Mr. Fay. There was also in evidence other checks bearing dates prior to October 2d, and some of later date which were also certified by either Beckwith or Spear. There was also evidence from which the jury might infer that neither at the time of the writing of these letters or at the time of the certification of the check dated November 1st, and certified October 2d, nor at the time of the certification of any of the other checks in evidence, the subject of one or other of the several counts upon which the defendant was convicted, did she have upon deposit in the Oberlin bank the funds to meet any one of such checks. That these letters tend to show Mrs. Chadwick's purpose to bring about an unlawful violation of section 5208, Rev. St. through an arrangement or agreement with either Beckwith or Spear, or both, and that their consent to her scheme was to be induced by her assurances of safety and promises of reward, there can be no doubt. If, therefore, there was any conspiracy between either Spear or Beckwith and some other person to violate the certification statute in respect of checks to be drawn or which had been drawn by Mrs. Chadwick, the admis-

sions found in these letters point to Mrs. Chadwick herself as the other party to the conspiracy and establish her unlawful intent. The letters are also an admission of the nature of her relations to the persons to whom the letters are addressed. That an unreceived letter is not evidence against the person addressed is, of course, elementary

These letters by themselves would be of no weight as against either Beckwith or Spear. Upon the other hand, if independently of the letters the fact of a conspiracy is established as existing at the time they were penned, there could be no doubt of the admissibility of these documents as declarations or admissions by one in furtherance of the conspiracy, and therefore competent against all. In general terms the jury were so instructed. The fact of the existence of a conspiracy is a fact which is seldom capable of express or direct proof. But evidence of an express agreement to violate the certification statute was not necessary. Evidence of facts and circumstances from which the existence of a preconcerted plan might be inferred is enough. And so, too, the facts and circumstances from which a conspiracy is to be inferred may be and often must be shown singly. Their collocation is for the jury, and the order in which they may be shown is generally one in the discretion of the court.

In Wharton upon Criminal Law (10th Ed.) 1398, it is said:

"The actual fact of conspiring may be inferred, as has been said, from circumstances, and the concurring conduct of the defendants need not be directly proved. Any joint action on a material point, or collocation of independent but co-operative acts, by persons closely associated with each other, is held to be sufficient to enable the jury to infer concurrence of sentiment; and one competent witness will suffice to prove the co-operation of any individual conspirator. If, therefore, it appear that two or more persons, acting in concert, are apparently pursuing the same object, often by the same means, one performing part of an act, and the other completing it, for the attainment of the object, the jury may draw the conclusion that there is a conspiracy."

In Reilley v. U. S., 106 Fed, 896, 46 C. C. A. 25, 35, this court said:

"It is also urged that the evidence did not justify the verdict, in that there was no proof of conspiracy to do what was done. As has been often remarked, it is not necessary that direct evidence of a formal agreement should be given in such cases. If the evidence of the separate details of the transaction as it was carried out indicates with the requisite certainty the existence of a preconcerted plan and purpose, that is sufficient; and we think the evidence was such as to warrant the verdict."

The fact of the accession of Spear and Beckwith to the scheme entertained by Mrs. Chadwick, as indicated in these letters, was, like all other facts needed to complete the evidence of a conspiracy, a fact which might be shown by indirect or circumstantial evidence. The business or social relation of the parties before and after the date of these letters; other acts of a similar character to that which Mrs. Chadwick had in mind to procure as shown by these documents; the state of her account with the bank of which Spear and Beckwith were officers; the fact, if it be so, that a check answering the description of the one which these letters show she intended to have certified or acknowledged having received—were all circumstances from which the jury might infer the accession of Beckwith and Spear to a scheme for the violation of section 5208, Rev. St., similar to that divulged by

141 F.—16

these written admissions of the defendant. Thus the "interpretation and force" of the admissions in these letters would depend in large part upon the other facts and circumstances or as the court said to the jury "upon the surrounding circumstances." These might be such as to justify an inference that these letters had in fact been received and acted upon by Beckwith and Spear, or that a concert of action similar to that admitted by these letters and for the purposes there shown, was inferable irrespective of the receipt of these particular communications between the parties. The scope and evidential value of these documents was, therefore, dependent upon their being read in the light of all of the evidence in the case. This is what the learned court meant and what the jury as reasonable men of affairs must be regarded as having understood, when the court said that:

"You will give them such interpretation and force as, under all the circumstances, you think them fairly entitled to."

It would be a most unjustifiable and forced inference to interpret this instruction as giving a free rein to the jury. Indeed, the following sentence seems to place a somewhat narrow limitation of their evidential value, as only furnishing "some information as to the kinds of transactions carried on between the defendant and Beckwith and Spear," and "as throwing light upon the question of the relation which she and they sustained to the bank." A limitation of the inferences to be drawn from these letters, when read in the light of all of the other facts and circumstances of the case as affording "some information" upon the kinds of transactions she and Beckwith and Spear were engaged in, and as to the relations which she and they sustained to the bank, is at least a limitation of which the plaintiff in error cannot complain.

5. We have carefully examined the charge of the court in connection with the other assignments of error based upon exceptions reserved. None of these are well taken, and none are of sufficient importance to require special attention. A number of special requests for further direction were denied. One of these was the seventh, and reads as follows:

"The defendant was not bound to know the rules of the bank or the law governing the officers of the bank with reference to certifying checks, and in the absence of such knowledge she could not be held to have conspired with the officers of the bank, if what she did was done in good faith, and without any criminal intention to do the unlawful act complained of."

Upon this matter of intent, the court said:

"I am asked by the government to charge, and I do charge in this connection, that the jury is instructed, on the question of intent on the part of the defendant, that the law presumes that every person intends the natural and ordinary consequences of his acts. Wrongful acts, knowingly or intentionally committed, cannot be justified on the ground of innocent intent. Ordinarily the intent with which a man does a criminal act is not proclaimed by him, and ordinarily there is no direct evidence from which the jury may be satisfied, from declarations of the criminal himself, as to what he intended when he did a certain act. And this question of intent, like all other questions of fact, is solely for the jury to determine from the evidence in the case."

In reference to the defendant's knowledge of the statute forbidding certification when the drawer had no funds upon deposit, the court said:

"The claim is made by counsel for the defendant that there is no proof that the defendant had knowledge that the act of certifying the check, if done as claimed in the indictment, was in violation of the law. On this point, I say to you, gentlemen, that a conspiracy cannot exist without a guilty intent being then present in the minds of the conspirators; but this does not mean that the parties must know that they are violating the statutes of the United States. The government is not required to prove, in order to sustain a verdict of guilty, that the parties knew that some statute forbade the acts they were performing. If these acts of certifying checks, or any of them as charged in the indictment, were in fact violations of the law, the defendant is to be held guilty if she, as charged in the indictment, conspired with Beckwith or Spear in bringing about their certification; and the question of her knowledge or her ignorance of such acts being contrary to law is not a fact which you have a right to consider. The only question for you to pass upon is whether the defendant violated the law; not whether she had any knowledge that she was violating the law."

We think there was no error in the denial of the request as preferred nor in the charge as given. The indictment is for a statutory conspiracy to violate a penal statute of the United States. Knowledge that the act which it was the object of the conspiracy to do would be in violation of the law is imputed and need not be proven. Neither do we understand that in courts of the United States the fact that the object of the conspiracy was to do an act which is only mala prohibita requires evidence of knowledge of the unlawfulness of the act purposed by the conspirators. The conspiracy itself is one created by statute and is made out by evidence that its object was to perpetrate some offense against the United States. Undoubtedly something more than a mere certification in excess of a deposit is necessary to make the offense punishable under section 5440 [U. S. Comp. St. 1901, p. 3676] and Act July 12, 1882, c. 290, 22 Stat. 166 [U. S. Comp. St. 1901, p. 3497]. A wrongful intent is of the essence of the matter, and the act of certification must be willful and charged as such. There must be an evil design, a wrongful purpose. Therefore willful ignorance as to whether the drawer had money on deposit or not or knowledge that she did not must be shown. Potter v. U. S., 155 U. S. 438, 446, 15 Sup. Ct. 144, 39 L. Ed. 214; Spurr v. U. S., 174 U. S. 728, 735, 19 Sup. Ct. 812, 43 L. Ed. 1150. But knowledge of the statute forbidding a certification in excess of a deposit is imputed. An unlawful or wrongful intent may be implied from the intentional doing of an unlawful act. Agnew v. U. S., 165 U. S. 36, 49, 50, 53, 17 Sup. Ct. 235, 41 L. Ed. 624. In Spurr v. U. S., cited above, the court said:

"If an officer certifies a check with the intent that the drawer shall obtain so much money out of the bank when he has none there, such officer not only certifies unlawfully, but the special intent to violate the statute may be imputed. And so evil design may be presumed if the officer purposely keeps himself in ignorance of whether the drawer has money in the bank or not."

6. Among the names duly drawn from the box as one of the venire from which a jury was to be selected was that of Butler Crane. In answer to this name, when called by the clerk, one Bentley F. Crane

appeared, and upon examination as to his qualifications was accepted as a juror and served as such. Upon the ground that Bentley F. Crane had not been drawn as a juror in the mode required by law, but had appeared and answered to the name of Butler Crane, the defendant, after verdict, moved for a new trial, and the refusal of the court to grant a new trial upon this ground is now assigned as error. The bill of exceptions includes the exhibits and affidavits bearing upon this matter, and from this evidence we are satisfied that the juror intended to be summoned and who was actually notified to appear was Bentley F. Crane. There was no such person as Butler Crane, and when Bentley F. Crane was notified to appear he assumed that he was the person intended and acted in perfect good faith in assuming that it was simply a case of misnomer. He was a farmer in good repute residing at Shalersville, Portage county, which was the address of the "Butler Crane" drawn from the jury box, and knew that there was no Butler Crane in that township or county. He answered to the name of Butler Crane when called as one of the venire tendered the defendant, but says that as Mr. Dawley, one of the defendant's counsel, was from his neighborhood and known to him, he assumed that Mr. Dawley knew that his right name was "Bentley" and not "Butler." The name was one of a number furnished the clerk of the court, at his request, by Judge Robertson, a state judge, residing in Portage county. Judge Robertson personally knew Bentley Crane and undertook to furnish his name. By either the clerical mistake of the judge's stenographer or of the deputy clerk who transcribed the name from Judge Robertson's list the name "Bentley" was written "Butler" upon the card which went into the jury box. In sound and appearance there is so much similarity as to easily account for the mistake. Bentley Crane was qualified as a juror, was disinterested, and the only irregularity consists in this misnomer. It was not a case of the wrongful impersonation of a juror duly summoned by a stranger as in McGill v. State, 34 Ohio St. 228.

There is no evidence of willful misconduct upon the part of any one in this matter. If counsel had examined the juror as to his name, the misnomer would have been discovered. This they did not do. It is said that counsel did not know that his name was Bentley Crane and had a right to presume his name was correctly transcribed upon the list of jurors furnished them. We may assume this to be so, and also assume that, if there had been in fact a Butler Crane competent for jury service in this case, a serious question might arise if the defendant was misled into accepting one juror when they had reasonable ground for supposing she was securing another. But that is not this case. It affirmatively appears that there was no such person as Butler Crane, and that the juror intended to be summoned and actually summoned was the juror Bentley Crane. The defendant secured the juror she elected to accept, although his name was Bentley Crane, and not Butler Crane. Under such circumstances the question, arising only upon a motion for a new trial, was one for the exercise of the sound discretion of the trial judge. If he was satisfied that no fraud was intended and no substantial right of the defendant

had been prejudiced or embarrassed, he might well deny a new trial upon such a case. There is nothing better settled than that the denial of a new trial upon any ground which appeals to the discretion of the trial judge is not the subject of an exception nor assignable as error here. Moore v. U. S., 150 U. S. 57, 61, 14 Sup. Ct. 26, 37 L. Ed. 996; Blitz v. U. S., 153 U. S. 308, 14 Sup. Ct. 924, 38 L. Ed. 725.

The question as presented upon this record seems to be quite within the range of the sound discretion of the trial judge, and in the absence of evidence of grave abuse is not the subject of review when presented only under an assignment of error in refusing a new trial.

7. The district attorney in his closing argument said, among other things:

"Bedortha is dead; Beckwith is dead; two other directors are sick. A suspended bank—and do you know what that means? The widows, the orphans whose hopes of peace and prosperity in old age have been robbed from them. Have you thought of what that means? The ambitions of youth whose all was there. The absolute necessity of the lives of men and comforts of men and women and children. All swept away. Death, sickness, and destruction in your path!"

To this the defendant at the time objected, and then excepted. No ruling was made. The passage is severed from its context, but we can infer that the district attorney was endeavoring to impress the jury with the evil results which had followed from the unlawful conspiracy charged by the indictment. There was evidence that Bedortha, a director of the Oberlin bank, was dead; that Beckwith, its president, was dead; that two other directors were sick; and that the bank had suspended. The inferences drawn from these facts may have been extravagant. But we do not understand it to be the province of a court to limit the arguments of counsel when they are based upon any evidence in the case. There is a degree of liberty allowable to counsel, whether for the government or the accused, in respect to the line of argument they shall pursue and the inferences to be drawn from the evidence which a trial judge should respect until the facts of the case are overstepped or arguments used which plainly abuse the privilege. But when facts not in evidence are stated to the jury, or arguments advanced plainly not justified by the evidence, and calculated to arouse prejudices incompatible with even-handed justice or an orderly course of procedure, it is the right and privilege of the counsel for the accused to object and ask the interference of the court and to except when the court denies the appeal. But to entitle the accused to a reversal when objection is made and the language not withdrawn it must appear that the matter objected to was plainly unwarranted and so improper as to be clearly injurious to the accused. Kellogg v. U. S., 103 Fed. 200, 43 C. C. A. 179; Dunlop v. U. S., 165 U. S. 498, 17 Sup. Ct. 375, 41 L. Ed. 799. There was enough in the facts proven for one purpose or another to warrant the counsel in referring to the facts stated as facts in the language complained of. The rest of the paragraph consists of inferences by which the counsel accounted for the facts or in a picture of the sorrow, distress, and ruin which are the ordinary consequences of a broken bank. It cannot be seriously claimed that the argument and influence of counsel

complained of were so grossly unwarranted and improper as to be palpably injurious to the accused. Unless this does appear, a reviewing court should not reverse upon such an assignment of error. People v. Ward, 105 Cal. 335, 340, 38 Pac. 945; Dimmick v. U. S. (C. C. A.) 135 Fed. 257, 270.

Upon the motion for a new trial, objection was urged to certain other paragraphs in the closing argument of the district attorney. A sample of one of the paragraphs complained of is the following:

"Gentlemen, I say to you in my closing argument, in my closing words, as a final appeal to your judgment, your intelligence, your courage, that the evidence in this case conclusively proves, beyond the existence of a reasonable doubt, the truth of the allegations in this indictment. Proves that you have before you what 12 men may, in this country, have never had before them in all criminal history—a criminal of such conspicuous note—notorious and dangerous a character—from the evidence in the case—the fate of whom never was determined before by any jury in any court. You have the opportunity to do right to-day. You have also the opportunity to-day to do wrong. What you shall do rests with you, under the charge of the court, your conscience and your God. That is where it rests with me. Whatever you may do, I feel that I have done, in my humble way, the best that I know, from the evidence in the case, to convict the most dangerous criminal known to human society to-day."

No objection or exception was taken to this or any other part of the district attorney's address to the jury, at the time or prior to the verdict, except a single paragraph heretofore set out in a foregoing part of this opinion. In the heat of argument counsel are sometimes led to make observations not justified by evidence and calculated to prejudice the accused. But when this is the case it is the duty of opposing counsel to promptly call the attention of the court to the matter and of the court to rule upon the objection and caution the jury and reprove counsel. In Dunlop v. U. S., 165 U. S. 487, 498, 17 Sup. Ct. 375, 41 L. Ed. 799, when objection was made promptly to the language of counsel for the government in addressing the jury, the court ruled that it was improper and the language immediately withdrawn by counsel, which the court held to be a condonation of his error in making it. "In such cases," said the court, "however, if the court interfere and counsel promptly withdraw the remark, the error will generally be deemed cured. If every remark made by counsel outside of the testimony were ground for reversal, comparatively few verdicts would stand, since in the ardor of advocacy and in the excitement of trial even the most experienced of counsel are occasionally carried away by this temptation." To same effect is case of Kellogg v. U. S., 103 Fed. 200, 43 C. C. A. 179, decided by this court. But here no objection was made and no complaint urged until upon motion for a new trial. Nothing is better settled than that the defendant who deems himself prejudiced by the language of counsel should promptly and publicly object and point out the language deemed improper and then take exception if the trial judge fail to condemn it. It is too late to predicate error upon the refusal of the trial judge to grant a new trial on account of a complaint made only after verdict and upon a motion for a new trial. Crumpton v. U. S., 138 U. S. 361, 11 Sup. Ct. 355, 34 L. Ed. 958; King v. State, 91 Tenn. 620, 642, 644,

20 S. W. 169; State v. Ward, 61 Vt. 153, 17 Atl. 483; Shelp v. U. S., 81 Fed. 694, 26 C. C. A. 570; 12 Cyc. 585.

In Crumpton v. U. S., cited above, the court said:

"When the defendant's counsel in a criminal case fails to at once call the attention of the court to remarks made by the prosecuting officer, which are supposed to be objectionable, and to request its interposition, and in case of refusal, to note an exception, an assignment of error in regard to them is untenable."

8. Finally, it is urged that the court had no power to pronounce cumulative sentences. The defendant was tried and convicted upon seven distinct counts. The crimes charged were of the same character, although each count charged a distinct and separate conspiracy to violate section 5208 by the unlawful certification of distinct checks drawn by the defendant against the same bank. Separate indictments might have been returned and seven distinct trials might have been had or all of the indictments might have been tried before the same jury. Under convictions upon separate counts for distinct offenses of the same character sentence may be passed and judgment entered for a specified term of imprisonment upon each count, and each term may be consecutive and cumulative. It is not error to make one term of imprisonment to begin when another terminates. If this is not so, there is no other mode in which an accused may be sentenced upon several convictions under several indictments or one indictment with two or more counts upon distinct offenses. The question has heretofore been before us and the power to impose cumulative sentences affirmed unanimously, the opinion of the court being by District Judge Clark. Howard v. United States, 75 Fed. 986, 21 C. C. A. 586, 34 L. R. A. 509. Cumulative sentences were affirmed, though the objection does not seem to have been distinctly considered by the Supreme Court, in Blitz v. U. S., 153 U. S. 308, 317, 14 Sup. Ct. 924, 38 L. Ed. 725, in Re Henry, 123 U. S. 372, 8 Sup. Ct. 142, 31 L. Ed. 174, in Re Mills, 135 U. S. 263, 10 Sup. Ct. 762, 34 L. Ed. 107, and in Re De Bara, 179 U. S. 316, 21 Sup. Ct. 110, 45 L. Ed. 207.

The conclusion we reach is that there is no reversible error, and the judgment of the court below is accordingly affirmed.